Judge Cote

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UBS SECURITIES LLC,

                        Plaintiff,

              v.

FRIDOLIN VOEGELI, MARCEL
GRUBENMANN, HANS-FELIX VOEGELI,
THOMAS BACHMANN, FELIX SCHERRER,
PRIMUS FELLMANN, MARCO GEMMA
and ERNESTO SURBECK,

                      Defendants.

No. 09 CV 8872 (DLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT

Plaintiff UBS Securities LLC ("UBS Securities"), formerly known as UBS Warburg LLC, by its attorneys Sullivan & Cromwell LLP, as and for its Complaint in this action, alleges as follows:

### NATURE OF ACTION

1.    This is a diversity action in which UBS Securities seeks a preliminary and permanent injunction restraining defendants Fridolin Voegeli, Marcel Grubenmann, Hans-Felix Voegeli, Thomas Bachmann, Felix Scherrer, Primus Fellmann, Marco Gemma and Ernesto Surbeck ("Defendants") from prosecuting certain claims against UBS Securities in an arbitration proceeding before the Financial Industry Regulatory Authority ("FINRA"). The claims at issue here are contained in the

Statement of Claim, attached hereto as Exhibit A, that Defendants filed with FINRA on

February 28, 2009, titled *Voegeli et al.* v. *UBS Warburg, L.L.C.*, FINRA No. 09-01501

(the "Statement of Claim"). (UBS Securities is the successor entity to UBS Warburg

LLC, and references herein to the former are intended to refer to the latter during the

period of its existence.)

      2.    As alleged more fully below, Defendants assert in their Statement of

Claim that they are Swiss investors who suffered losses in connection with investments

that they made between 1998 and January 2002 in a company called HealtheTech, Inc.

("HealtheTech"). Ostensibly to recover their alleged losses, Defendants instituted a

FINRA arbitration proceeding against UBS Securities in 2009 claiming compensatory

damages of more than $13,000,000 and punitive damages of more than $27,000,000 more

than six years after the alleged events giving rise to their claims.

      3.    In attempting to compel UBS Securities to arbitrate their claim,

Defendants do *not* allege that they (i) bought, sold, or held HealtheTech securities with

UBS Securities; (ii) executed a customer agreement or arbitration agreement with UBS

Securities; (iii) ever had an account with UBS Securities; or (iv) suffered any losses in

any UBS Securities account. In short, they do not allege that they had any direct

relationship whatsoever with UBS Securities.

      4.    Rather, Defendants allege that they *held* HealtheTech shares during a

period in 2002 when UBS Securities was advising HealtheTech on its Initial Public

Offering, consummated later that year. Defendants do not allege that they were party to

any agreement with UBS Securities in connection with the HealtheTech IPO; nor were

they.  They also do not allege that they bought HealtheTech shares in the HealtheTech

IPO, conceding instead that at the time of the IPO they already held the shares that are the

subject of their FINRA arbitration.  Rather, Defendants appear to contend that UBS

Securities' advisory relationship *with HealtheTech* suffices to compel UBS Securities to

arbitrate *with Defendants.*

        5.    On these facts, Defendants cannot force UBS Securities into an

arbitration proceeding regarding their out-of-date claims, as they have no agreement or

relationship with UBS Securities sufficient to compel arbitration.  Arbitration is a

creature of contract.  There is no agreement between Defendants and UBS Securities to

arbitrate these or any claims, and the FINRA rules governing mandatory arbitration for

FINRA members such as UBS Securities also do not compel UBS Securities to arbitrate

this claim.  FINRA members are obliged by FINRA Rule 12200 to arbitrate disputes only

if the "dispute is between a customer and a member or associated person of a member,"

but Defendants are not now and have never been "customers" of UBS Securities or an

associated person of UBS Securities.

        6.    Defendants' claims are also ineligible for arbitration because the

relevant statutes of limitations have long since run on those claims, and because more

than six years elapsed between the occurrences or events giving rise to the Statement of

Claim and the filing of the Statement of Claim, exceeding the time-eligibility limit

imposed by FINRA Rule 12206: "No claim shall be eligible for submission to arbitration

under the Code where six years have elapsed from the occurrence or event giving rise to

the claim."

7.    In short, there is no legal basis upon which UBS Securities can be forced to arbitrate the claims brought against it in the FINRA proceeding Defendants have instituted.

8.    This issue is ripe for decision by this Court now, because being compelled to arbitrate a dispute one has not agreed to arbitrate constitutes irreparable harm as a matter of law and federal court precedents establish the necessity of intervening before arbitration to protect a party from being forced to participate in arbitration proceedings it did not agree to.  Accordingly, Defendants' pursuit of their claims in the FINRA arbitration should be enjoined.

## THE PARTIES

9.    Plaintiff UBS Securities is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York.  Prior to June 9, 2003, UBS Securities was known as UBS Warburg LLC, the name under which Defendants brought their Statement of Claim with FINRA in 2009.

10.    Upon information and belief, and according to their Statement of Claim, each Defendant is a resident of Switzerland.

## JURISDICTION & VENUE

11.    This is an action for injunctive relief pursuant to Federal Rule of Civil Procedure 65(a).

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  Specifically, plaintiff UBS Securities is

a citizen of New York, Defendants are residents of Switzerland, and in the arbitration

sought to be enjoined Defendants seek damages from UBS Securities exceeding $75,000.

13.    This Court has personal jurisdiction over each of the Defendants

because this lawsuit arises out of specific activities undertaken by each of the Defendants

within the State of New York, namely instituting a FINRA arbitration proceeding against

UBS Securities.

14.    Venue is proper in this judicial district under 28 U.S.C. § 1391(a)(2)

because a substantial part of the events giving rise to this lawsuit occurred within this

judicial district.  In particular, Defendants brought their arbitral claim in this District.

## FACTUAL BACKGROUND

15.    On February 28, 2009, Defendants filed a Statement of Claim with

FINRA, instituting arbitration proceedings against UBS Securities.

16.    The Statement of Claim alleges that (i) Defendants were and are

shareholders of HealtheTech; (ii) in 2002, UBS Securities acted as a financial advisor to

HealtheTech, advising HealtheTech in relation to its initial public offering; (iii) also in

2002, UBS Securities breached an unspecified "fiduciary duty" by encouraging

HealtheTech to enter into a Strategic Partnership with HealthSouth Corporation

("HealthSouth") and by allegedly short-selling HealtheTech stock; (iv) also in 2002, in

the course of advising HealtheTech on its IPO, UBS Securities—by "falsely

represent[ing] . . . the value of HealtheTech common shares"—fraudulently induced

Defendants to enter lock-up agreements with HealtheTech preventing them from selling

their HealtheTech shares for a period following the IPO; and (v) still in 2002, UBS Securities negligently misrepresented the value of HealtheTech shares.

17.    On June 25, 2009, UBS Securities responded to the Statement of Claim (i) pointing out the non-arbitrability and time-ineligibility of Defendants' Statement of Claim; (ii) denying Defendants' allegations; and (iii) stating, *inter alia*, that at all times in connection with the HealtheTech matter, UBS Securities acted in compliance with all applicable securities laws and regulations and industry standards of conduct.

18.    Though Defendants claim UBS Securities must arbitrate because Defendants allegedly were "customers" of UBS Securities, the Statement of Claim does not allege that Defendants actually had any customer relationship with UBS Securities, nor that UBS Securities had any agreement with Defendants to arbitrate any dispute.  In fact, the Statement of Claim does not allege that any Defendant ever (i) opened or maintained an account with UBS Securities; (ii) executed a customer agreement or arbitration agreement or any other agreement with UBS Securities; (iii) purchased or placed any of the securities at issue with UBS Securities; (iv) suffered any losses in any UBS Securities account; (v) communicated with any employee of UBS Securities during the events at issue; or (vi) had any direct relationship whatsoever with UBS Securities.

19.    In fact, as far as UBS Securities can determine, none of the Defendants now is or ever was a customer of UBS Securities.

20.    Moreover, UBS Securities did not have an arbitration agreement even with HealtheTech.  To the contrary, engagement letters between UBS Securities and

- 6 -

HealtheTech specify that all disputes "arising out of or in any way relating to this agreement" must be brought in "the courts of the state of New York located in the city and county of New York or in the United States District Court for the Southern District of New York."

21.    In light of these glaring jurisdictional defects, on May 20, 2009, counsel for UBS Securities wrote counsel for Defendants pointing to relevant caselaw establishing that because Defendants are not customers of UBS Securities, Defendants cannot compel UBS Securities to arbitrate their claims, and inquiring on what basis Defendants believed UBS Securities was obligated to arbitrate those claims.

22.    On June 4, counsel for Defendants responded with two theories of jurisdiction:

23.    First, counsel for Defendants claimed that some Defendants had direct or—in most cases—indirect interests in accounts held "with UBS." By "UBS," he apparently meant the Swiss bank UBS AG—which was not involved in the HealtheTech IPO—not UBS Securities—which is the lone respondent named in the Statement of Claim. Without providing documentation actually supporting his assertion, Defendants' counsel alleged that (A) one defendant, Mr. Surbeck, maintains an account "with UBS," apparently meaning UBS AG; (B) one defendant, Mr. Fridolin Voegeli, is a shareholder of a Swiss company that in turn maintains an account "at UBS," again apparently meaning UBS AG; and (C) the other Defendants are customers of a private wealth management company that in turn allegedly maintains accounts "at UBS," meaning apparently some entity other than UBS Securities. Counsel did not allege that any of

- 7 -

these purported accounts had any connection to the conduct at issue in the Statement of Claim. On the contrary, he admitted that "they may not be directly relevant to the claims in this proceeding."

24.    Even assuming these accounts actually exist, and even if Defendants could somehow avail themselves of interests in accounts third parties purportedly hold with UBS *AG*, as a matter of law, nothing about these relationships suffices to compel UBS *Securities* to arbitrate Defendants' claims. UBS AG is not UBS Securities—the respondent in the Defendants' arbitral claim—and the relationship between UBS AG and UBS Securities does not suffice to compel UBS Securities to arbitrate claims against it. Defendants do not allege that UBS AG had anything whatsoever to do with HealtheTech or that the purported accounts "with UBS" were in any way connected to the alleged events detailed in the Statement of Claim.

25.    Second, perhaps realizing that Defendants had no relationship with UBS Securities, Defendants' counsel also asserted that no actual customer relationship is *necessary* to compel a customer arbitration. Defendants relied on FINRA Rule 12100(g), which limits who may be deemed a "*customer*" for purposes of arbitration: "A customer shall not include a broker or dealer." Defendants assert this limitation is the sole bound for who is a "customer" for FINRA's purposes, such that any party that is not a broker or dealer is thus—*ipso facto*—a customer of any FINRA member. There is no support for this theory.

26.    None of these purported relationships suffice under FINRA Rule 12200 and applicable caselaw to make any Defendant a customer of UBS Securities.

UBS Securities therefore has not agreed to arbitrate any dispute with any of the Defendants.

27.    In addition, all of the alleged fraudulent conduct by UBS Securities forming the basis for Defendants' Statement of Claim occurred in 2002, more than six years prior to the filing of the Statement of Claim.  Accordingly, Defendants' claims are not eligible for arbitration under FINRA Rule 12206, which provides that "[n]o claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim."  Further, Defendants could have been, should have been, and indeed *were* aware of the conduct they allege to have been fraudulent several years prior to the filing of their Statement of Claim.  The claims are also barred by the statutes of limitations applicable to the underlying causes of action.

28.    UBS Securities has notified FINRA and the arbitral panel both through briefing and in conference that this matter is not subject to arbitration.  Neither FINRA nor the arbitral panel has yet taken a position on the arbitrability of this dispute. Nonetheless, UBS Securities is compelled to seek relief in this Court, because (i) at an Initial Pre-hearing Conference, the arbitral panel stated that it had no authority to compel Defendants to demonstrate that the dispute is in fact arbitrable prior to arbitration; and (ii) in any event, because arbitration is a creature of contract and UBS Securities has not agreed to submit either the merits of this dispute *or its arbitrability* to an arbitral panel, the panel has no authority to decide the arbitrability of this dispute.

## CAUSE OF ACTION

(For an injunction prohibiting Defendants from pursuing the arbitration)

29.   UBS Securities repeats and realleges paragraphs 1 through 28 as though fully set forth herein.

30.   UBS Securities has not agreed to arbitrate any dispute with any of the Defendants.

31.   None of the Defendants is a "customer" of UBS Securities, as that term is used in FINRA Rule 12200, which requires member firms to arbitrate customer disputes at the request of their customers.  None of the Defendants is a customer of an "associated person" of UBS Securities.

32.   More than six years elapsed between the occurrences or events purportedly giving rise to the Statement of Claim and the filing of the Statement of Claim, exceeding the statutes of limitations on the underlying causes of action as well as the time-eligibility limitation imposed by FINRA Rule 12206.

33.   Defendants have asserted claims for money damages against UBS Securities in the arbitration proceeding and, on information and belief, unless enjoined will continue to pursue such claims to judgment.

34.   Unless Defendants are enjoined from pursuing their claims in the arbitration proceeding, UBS Securities will suffer irreparable harm because UBS Securities will be forced to incur the expense of defending itself in the arbitration proceeding or risk an adverse outcome in those proceedings, in which Defendants seek approximately $41,000,000 in compensatory and punitive damages, even though UBS

Securities is not legally subject to compelled arbitration of these claims. Being compelled to arbitrate a dispute one has not agreed to arbitrate constitutes irreparable harm as a matter of law. *See Mount Ararat Cemetery* v. *Cemetery Workers & Greens Attendants Union, Local 365*, 975 F. Supp. 445 (E.D.N.Y. 1997).

35.    UBS Securities has no adequate remedy at law, because any post-arbitration challenge by UBS Securities to an arbitrator's award would still require UBS Securities to defend itself in an arbitration proceeding to which it did not consent, and because submitting this dispute to arbitration would prejudice UBS Securities' position regarding the dispute's arbitrability.

36.    Defendants will suffer no irreparable harm in the event an injunction issues.

37.    The balance of equities weighs in favor of an injunction.

38.    The public interest would be served by enjoining Defendants from pursuing their claims against UBS Securities in arbitration proceedings when UBS Securities is not legally bound to arbitrate.

WHEREFORE, UBS Securities respectfully requests that this Court enter an order preliminarily and permanently enjoining Defendants from pursuing any claims against UBS Securities in the arbitration proceedings, awarding UBS Securities costs of suit, and granting such other relief as may be just and proper.

Dated: October 20, 2009
      New York, New York

UBS Securities LLC

By:

Robert J. Giuffra, Jr.
Brent J. McIntosh
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000 (tel.)
(212) 291-3588 (fax)
giuffrar@sullcrom.com
mcintoshb@sullcrom.com

*Counsel for plaintiff UBS Securities LLC*

- 12 -

# Exhibit A

UNDER THE CODE OF ARBITRATION PROCEDURE
OF THE
FINANCIAL INDUSTRY REGULATORY AUTHORITY
-------------------------------------------------------------X
In the Matter of the arbitration between


FRIDOLIN VOEGELI, MARCEL GRUBENMANN,
DR. HANS-FELIX VOEGELI,
DR. THOMAS BACHMANN,
FELIX SCHERRER, PRIMUS FELLMANN,
MARCO GEMMA and ERNESTO SURBECK,

                    Claimants,


          -and-


UBS WARBURG, L.L.C.,
                    Respondent.
-------------------------------------------------------------X

## STATEMENT OF CLAIM
### Preliminary Statement

This claim is filed on behalf of eight Swiss residents who were all early stage investors in a company called HealtheTech, Inc. At the time of the events detailed herein, claimants owned a total of 1,423,333 shares of HealtheTech preferred stock. In the spring of 2002, in preparation for the Company's Initial Public Offring, HealtheTech's common shares were forward split with four shares being issued in exchange for every three shares of common stock.


## I—PARTIES AND JURISDICTION

1.    At all relevant times, Claimant Fridolin Voegeli was a resident of Thalwil, Switzerland.    On or about March 1998 and November 1998, Mr. Voegeli purchased $600,000.00 of Mault Calorimetry Convertible Promissory Notes, and on or about January 1999, Mr. Voegeli agreed to convert these Promissory Notes into 240,000 shares and purchased 135,000 options of HealtheTech Series A preferred shares at a price of $2.50 per share.    On or about March 2000, Mr. Voegeli purchased 100,000 shares of HealtheTech Series B preferred shares at a price of $10.00 per share.    On or about July 2000, Mr. Voegeli purchased 200,000 shares of HealtheTech Series C preferred shares at a price of $10.00 per share.    As of the date of this Statement of Claim Mr. Voegeli owns 899,999 shares and 180,000 options of HealtheTech common stock (without adjusting for the 5 for 1 reverse stock split that occurred in 2003).

2.    At all relevant times, Claimant Marcel J. Grubenmann was a resident of Zurich, Switzerland.  On or about July 2000, Mr. Grubenmann purchased 100,000 shares of HealtheTech Series C preferred shares at a price of $10.0 per share.  As of the date of this Statement of Claim Mr. Grubenmann owns 133,333 shares of HealtheTech common stock (without adjusting for the 5 for 1 reverse stock split that occurred in 2003).

4.    At all relevant times, Claimant Dr. Hans-Felix Voegeli was a resident of Adlikon, Switzerland.    On or about July 2000, Dr. Voegeli purchased 10,000

shares of HealtheTech Series C preferred shares at a price of $10.00 per share. As of the date of this Statement of Claim, Dr. Voegeli owns 13,333 shares of HealtheTech common stock (without adjusting for the 5 for 1 reverse stock split that occurred in 2003).

5.    At all relevant times, Claimant Dr. Thomas Bachmann was a resident of Stettlen, Switzerland. On or about January 2002, Dr. Bachmann purchased 7,500 shares of HealtheTech Series C preferred shares at a price of $10.00 per share. As of the date of this Statement of Claim Dr. Bachmann owns 10,000 shares of HealtheTech common stock (without adjusting for the 5 for 1 reverse stock split that occurred in 2003).

6.    At all relevant times, Claimant Felix Scherrer was a resident of Zumikon, Switzerland. On or about July 2000, Mr. Scherrer purchased 10,000 shares of HealtheTech Series C preferred shares at a price of $10.00 per share. As of the date of this Statement of Claim Mr. Scherrer owns 13,333 shares of HealtheTech common stock (without adjusting for the 5 for 1 reverse stock split that occurred in 2003).

7.    At all relevant times, Claimant Primus Fellmann was a resident of Kusnacht, Switzerland. On or about November 2000, Mr. Fellmann purchased 10,000 shares of HealtheTech Series C preferred shares at a price of $10.00 per share. As of the date of this Statement of Claim Mr. Fellmann owns 13,333 shares

of HealtheTech common stock (without adjusting for the 5 for 1 reverse stock split that occurred in 2003).

8.    At all relevant times, Claimant Marco Gemma was a resident of Maur, Switzerland.  On or about November 2000, Mr. Gemma purchased 10,000 shares of HealtheTech Series C preferred shares at a price of $10.00 per share.  As of the date of this Statement of Claim Mr. Gemma owns 13,333 shares of HealtheTech common stock (without adjusting for the 5 for 1 reverse stock split that occurred in 2003).

9. At all relevant times, Claimant Ernesto Surbeck was a resident of Hallau, Switzerland.  On or about January 2002, Mr. Surbeck purchased 10,000 shares of HealtheTech Series B preferred shares at a price of $15.00 per share from an old Series B investor.  As of the date of this Statement of Claim Mr. Surbeck owns 13,333 shares of HealtheTech common stock (without adjusting for the 5 for 1 reverse stock split that occurred in 2003).

10.    For the purposes of the Code of Arbitration Procedure for Customer disputes, each of the claimants herein were customers within the meaning of Rule12100 of the Code which provides that the term "customer" simply shall not include a broker-dealer.

11. None of the claimants herein are broker-dealers.

12.    At all relevant times, Respondent UBS LLC was a broker-dealer duly registered with the Securities and Exchange Commission, and a member firm of the Financial Industry Regulatory Authority (FINRA).    Upon information and belief Respondent UBS LLC's Central Registration depository number is 7654.

13.    Upon information and belief, Respondent is a recidivist violator of Federal and State Securities Laws which routinely thumbs its nose at securities regulators. Annexed hereto as Exhbit A is a copy of respondents 279 page Brokercheck reports which lists some 279 regulatory events which include violations of the short-sale rules.    For example, on June 26, 2008, respondent executed an Acceptance, Waiver and Consent in which in consented to findings that it violated the short sale rules. In connection with this AWC, respondent was fined $116,000.

14.  The recidivist nature of Respondent's Corporate culture is further highlighted the fact the Respondent's parenyt company, UBS AG  entered into a deferred prosecution agreement with the United States Department of Justice to resolve a one count in formation that alleged thast UBS AG was engaged in a conspiracy to dewfraud the United States and the internal Revenue Service.  In connection with this Deferred Prosecution Agreement, UBS AG  agreed to pay $780million in fines, interest, penalties and restitution.    A copy of the Deferred Prosecution Agreement is annexed hereto as Exhibit B.  Additionally, in a related matter, UBS AG   entered into a settlement agreement with the Securities and Exchange

Commission in which UBS agreed to pay $200 million to settle the SEC's charges

that UBS AG was acting as an unregistered broker-dealer and investment advisor.

A copy of the Commission's release announcing the settlement is annexeds hereto

as Exhibit C.

15. Respondent is required to arbitrate the claims herein pursuant to rule 12200 of

the Code of Arbitration procedure which states:

> Parties must arbitrate a dispute under the Code if . . .the dispute is between a customer and a member and the dispute arises in connection with the business activities of the member, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Rule 12200.

Upon information and belief, respondent is not an insurance Company.

16. The claims herein arise from the investment banking and trading activities of

the Respondent.

17. Accordingly, Respondent is required to arbitrate these claims.

## II: BACKGROUND

18. HealtheTech was incorporated as Mault Calorimetry, Inc. in Delaware on

February 23, 1998 by James Mault, to develop and market his patented

Calorimeter. The Company changed its name to Calorie Management Systems,

Inc. in December 1998 and to HealtheTech, Inc. in 2000. Between the Company's

incorporation and August of 1999, claimant Fridolin Voegeli, as the only seed-

investor, purchased first some $600,000.00 Convertible Promissory Notes and then a group of Swiss and US investors purchased 606,000 shares of the Company's Series A Preferred stock at a price of $2.50 per share for a total investment of $2,269,982.50. Upon completion of the HealtheTech IPO, each share of Preferred stock A was automatically converted in to 1.33 shares of common stock (=807,993 common shares).

19. Upon the sale of the Convertible Promissory Notes, HealtheTech began development of its calorimeter, winning FDA approval for the device in December 2001.

20. From November 1999 to March 2000, mainly foreign industrial investors purchased some 400,000 shares of the Company's Series B Preferred stock at a price of $10.00 per share for an investment of some $4,000,000.00. Like the Series A preferred, each share of the Series B Preferred was automatically converted into 1.33 shares of common stock (= 533,327 common shares) upon the completion of the HealtheTech IPO.

21. From July 2000 until January 2002, industrial, institutional and private investors purchased some 5,000,000 shares of HealtheTech Series C Preferred stock at a price of $10.00 per share for a total investment of some $50,000,000.00. The Series C Preferred shares were also automatically converted into 1.33 shares of common stock (=6,666,639 common shares).

22. In fall of 2001, HealtheTech began plans for the incorporation of HealtheTech Europe in Switzerland.

23. In or about January 2002, UBS investment bankers proposed that HealtheTech make an initial public offering at a price of $22.00 per share.  At the same time HealtheTech entered into a financial services Advisory Agreement with Respondent UBS.

24. Upon information and belief, in or about March 2002, HealtheTech, with the assistance of Respondent UBS, entered into a Strategic Partnership with HealthSouth Corporation.  (A copy of this Strategic Partnership Agreement is annexed hereto as Exhibit A.)

25. Upon information and belief, in or about March 2002 UBS assisted HealthSouth, and HealtheTech in entering into this Strategic Partnership, Respondent UBS was HealthSouth's investment banker and knew or, in the exercise of due care should have known of the massive accounting fraud that was occurring at HealthSouth.  UBS also knew or should have known that the strategic relationship between HealtheTech and HealthSouth would account for more than half of HealtheTech's revenues.  Indeed, during the fiscal year ending December 31, 2002, HealthSouth accounted for some 56 percent of HealtheTech's revenues.

26. In or about March, 2002, Credit Suisse First Boston joined the investment banking team that was pushing the HealtheTech Board toward approval of the IPO. As part of the inducement to enter into the IPO, CSFB and Respondent UBS relied on the projected revenues from the Strategic Partnership with HealthSouth and increased HealtheTech's valuation to $40.00 per share.

27. Upon information and belief, Respondent UBS either knew or was reckless in not knowing that these valuations were artificially inflated because they improperly relied on projected revenues from the HealthSouth / HealtheTech Partnership, that UBS knew or was reckless in not knowing was likely to fail because of the accounting fraud at HealthSouth. Upon information and belief, shortly thereafter, UBS forced CSFB to withdraw as lead underwriter and replaced CSFB as the lead underwriter.

28. In or about February 2002, Respondent UBS induced Claimant Fridolin Voegeli to make a $2,000,000 personal loan to Healthetech's founder James Mault. This loan was secured by the pledge of 200,000 shares of HealtheTech common stock valued by UBS at $22.00 per share. Despite the fact that Respondent UBS knew or in the exercise of due care should have known of the accounting fraud at HealthSouth, and the effect HealthSouth's failure would have on HealtheTech's business prospects, respondent UBS never informed Claimant Fridolin Voegeli of the fraud at HealthSouth.

29. Between April 2002 and June 2002, Respondent UBS induced the Claimants herein to execute lock-up agreements whereby the Claimants agreed to lock up their shares for a period of 180 days following the closing of the HealtheTech IPO.

30. In order to induce claimants to agree to the lock-ups, respondent UBS continued to falsely represent that the value of Healthetech common shares was between $22.00 and $45.00 per share. A copy of the form of the Investor rights agreement containing the lock-up provision is annexed hereto as Exhibit D. Of course, Respondent UBS never disclosed to the Claimants their knowledge of the accounting frauds at HealthSouth.

31. On or about July 12, 2002, the HealtheTech IPO closed with HealtheTech selling some 4,000,000 shares (after the 3 to 4 split) at a price of $7.50 per share.

32. Upon information and belief, between July 12 and August 15, 2002, Respondent UBS executed illegal short sales of HealtheTech common stock for approximately 2,000,000 shares at $6.50 per share yielding Respondent UBS illicit profits of $13,000,000. (A copy of a report from Blumberg LLP showing the short interest in HealtheTech common shares to be 417,875 shares (= 2,089,375 shares pre 1 for 5 reverse split of 2003) on August 15, 2002, is annexed hereto as Exhibit E.) Multiplying the short interest by 5 to adjust for

the 5 to 1 reverse reveals that the total short interest as of August 15, 2002, just one month after the closing of the IPO was 2,089,375shares or more than half the shares issued in the IPO.

33. Upon information and belief, Respondent UBS still has not satisfied their delivery obligations for these shares.

34. On or about September 5, 2005, Claimant Voegeli, concerned about the losses he and the other Swiss investors suffered, wrote a letter to Peter Wufli, UBS' CEO, (a copy of this letter is annexed hereto as Exhibit F) complaining that UBS fraudulently induced the Claimants to proceed with the HealtheTech transactions and that UBS shorted some 2,000,000 shares of HealtheTech stock. On or about October 28, 2005, Respondent UBS responded to Mr. Voegeli's demand, fraudulently denying that UBS had any knowledge of the fraud at HealthSouth or that UBS had shorted any shares of HealtheTech. (A copy of UBS' response is annexed hereto as Exhibit G.) UBS' response constituted fraudulent concealment of their wrongdoing which tolled any limitations period.

35. Any relevant limitations period remained tolled until at least March 19, 2003 when the Securities and Exchange Commission filed a complaint that alleged the Healthsouth was engaged in a $1.4 billion accounting fraud. A copy of the Commission's complaint is annexed hereto as Exhbit H. Once the Commission

filed its complaint, HealthSouth became unable to perform its obligations under the Strategic Partnership agreement with HealtheTech.

36. As HealthSouth's investment banker, UBS was under an obligation to conduct a thorough due diligence investigation of HealthSouth. Respondent UBS failed miserably at fulfilling this obligation.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty)

37. As the lead investment banker and advisor to HealtheTech, Respondent UBS owed HealtheTech and its affiliates, including the Claimants herein, a fiduciary duty to exercise the utmost care in selecting strategic partners for HealtheTech. Respondent UBS breached that duty when it encouraged HealtheTech to enter into a Strategic Partnership with HealthSouth knowing that the partnership with HealthSouth was going to account for more than 50 percent of HealtheTech's revenues and that HealthSouth's inability to perform would be devastating to HealtheTech's business prospects.

38. Respondent UBS also breached its fiduciary duty to claimants when they engaged in toxic and illegal short selling of Healthetech common stock.

39. As a direct result of Respondent's breach of fiduciary duty to Claimants, Claimants have been damaged in the amount of $13,875,002.5 plus interest from July 12, 2002.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Fraudulent Inducement)

40. Claimants hereby reassert and re-allege each and every allegation contained in paragraphs 1 through 39 of this Statement of Claim as if they were more fully set forth herein.

41. Respondents fraudulently induced Claimants to enter into the lock-up agreements by failing to disclose to them the fact that UBS knew that there was a massive accounting fraud at HealthSouth and that it was extremely unlikely that HealthSouth would be able to continue to meet its obligations under the Strategic Partnership agreement with HealtheTech. These undisclosed facts were material facts.

42. Had Claimants been informed of the accounting fraud at HealthSouth, they would not have entered into the lock-up agreements.

43. When the Claimants entered into the lock-up agreements, they relied on the non-existence of these non-disclosed material facts.


44. As a result of Respondent's fraudulent inducement, Claimants have been damaged in the amount of $14,366,632.5 plus interest from July 12, 2002.


## AS AND FOR A THIRD CAUSE OF ACTION
### (Violation of Section 10b and Rule 10b-5)

45. Claimants hereby reassert and re-allege each and every allegation contained in paragraphs 1 through 44 of this Statement of Claim as if they were more fully set forth herein.

46. Respondent's fraudulent conduct took place in connection with the sale of HealtheTech's securities, specifically at HealtheTech's initial public offering.

47. In perpetrating their fraud, Respondent UBS made use of the instrumentalities of interstate commerce, specifically the US and International mail and telephone wires.

48. Upon information and belief Respondent UBS perpetrated their fraud through the use of the instrumentalities of interstate commerce.

49. Since Respondent UBS perpetrated a fraud in connection with the sale of securities through the use of the instrumentalities of interstate commerce, Respondent UBS violated Section 10-b of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

50. As a result of this violation, Claimants entered into lock-up agreements which prevented them from liquidating their holdings in HealtheTech in the weeks immediately after the HealtheTech IPO.

51. Upon information and belief, during this period Claimants would have been able to sell their HealtheTech shares for at least $7.50 per share.

52. Accordingly, as a proximate result of Respondent's violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, Claimants have been damaged in the amount of $13,875,002.50 plus interest from July 12, 2002.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

53. Claimants repeat and re-allege each every allegation contained in paragraphs 1 through 52 of this Statement of Claim as if they were fully set forth herein.

54. In order to induce Claimants to execute the lock-up agreement, Respondent UBS made the above mentioned material misrepresentations of fact with the knowledge that the misrepresentations were required before Claimants would execute the lock-up agreements. Without limitation, these material facts included the misrepresentation that HealtheTech shares would be valued at $40 to $45 per share after the IPO.

55. Respondent UBS made these representations knowing that the representations were made for the benefit of Claimants, that Claimants would rely on these representations, and that Claimants might be damaged if these representations were inaccurate.

56. Respondent UBS owed a duty to Claimants to take reasonable care that the above-mentioned material representations were accurate.

57. Respondent UBS made the above-mentioned material representations without a reasonable basis and failed to take reasonable care that the representations were accurate.

58. In fact, the Respondent UBS above-mentioned material representations were false and misleading.

59. Claimants justifiably relied on Respondent's above-mentioned false statements to its detriment, and have suffered damages as a proximate result of such reliance.

60. For Claimant's losses proximately caused by Respondent=s negligent misrepresentation of such material facts, Respondent is liable to the Claimants in an amount to be determined at the hearing of this matter, but in excess of $3,875,002.50 plus interest from July 12, 2002.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Violation of Section 349 of the General Business Law of the State of New York)

61. Claimants hereby reassert and reallege each and every allegation contained in paragraphs 1 through 60 of this Statement of Claim as if they were more fully set forth herein.

62. Respondent UBS' willful conduct constituted a deceptive trade practice in violation of Section 349 of the General Business Law of the State of New York.

63. Pursuant to Section 349 of the General Business Law, Claimants are entitled to recover their actual damages which equal their shareholdings multiplied by the

Initial Public Offering price of $7.50 per share.  Additionally, claimant Fridolin Voegeli is entitled to recover the principal amoun of his loan to jim Maul plus accrued interest.  This brings claimants' total damages to $13,875,002.50

64. Since Respondent UBS's conduct was willful, Claimants are entitled at the panel's discretion to the recovery of treble damages plus reasonable attorneys fees.

WHEREFORE, Claimants

Fridolin Voegeli, James Mault, Marcel Grubenmann, Dr. Hans- Felix Voegeli, Dr. Thomas Bachmann, Felix Scherrer, Primus Fellmann, Marco Gemma and Ernesto Surbeck respectfully request:

1.    Entry of an arbitral award against the Respondent in the amount of $13,875,002.5, which amount should be trebled pursuant to the provisions of Section 349 of the General Business Law of the State of New York

2.  pre-award interest from July 12, 2002

3.  reasonable attorneys fees,

4.  the costs and disbursements of this proceeding,

5.  together with such other and further relief as the panel may deem just

and proper.

Dated:  Staten Island, New York
      February 28, 2009

Respectfully Submitted,

Simon S. Kogan
Counsel for Claimants
27 Weaver Street
Staten Island, New York 10312
Tel: (718)984-3789