UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UBS SECURITIES LLC,                     :
                          Plaintiff,    :
                                        :
            -v-                         :
                                        :   09 CIV. 8872 (DLC)
FRIDOLIN VOEGELI, MARCEL GRUBENMANN,    :
HANS-FELIX VOEGELI, THOMAS BACHMANN,    :   <u>OPINION & ORDER</u>
FELIX SCHERRER, PRIMUS FELLMANN, MARCO  :
GEMMA, and ERNESTO SURBECK,             :
                                        :
                          Defendants.   :
                                        :
----------------------------------------X

APPEARANCES:

For Plaintiff:

Robert J. Giuffra, Jr.
Brent J. McIntosh
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

For Defendants:

Simon S. Kogan
27 Weaver Street
Staten Island, NY 10312


DENISE COTE, District Judge:

    Plaintiff UBS Securities LLC ("UBS Securities") brings this

action for declaratory and injunctive relief to enjoin

defendants from pursuing claims against UBS Securities in a

Financial Industry Regulatory Authority ("FINRA") arbitration

proceeding.  For the following reasons, UBS Securities is

granted a declaratory judgment and permanent injunction restraining defendants from prosecuting their claims against UBS Securities in the FINRA arbitration proceeding.

BACKGROUND

Defendants are Swiss citizens who were seed investors in a company called HealtheTech, Inc. ("HealtheTech"). UBS Securities -- in whom UBS AG, a Swiss corporation, holds a minority membership interest -- served as a financial advisor and underwriter to HealtheTech in connection with its initial public offering ("IPO") in 2002.[1] At some point during the process leading up to the IPO, HealtheTech's chairman provided defendant Fridolin Voegeli a copy of a January 2002 presentation that UBS Securities had given to HealtheTech's Board of Directors.[2] The January 2002 presentation included estimates of the projected value of HealtheTech's common stock after the completion of the IPO. Defendant Voegeli shared the presentation with the other defendants. As a condition of serving as underwriters for the IPO, the underwriters, including UBS Securities, required all insiders, including defendants, to execute "lockup" agreements promising that they would not sell

---

[1] At the time of HealtheTech's IPO in 2002, UBS Securities was known as UBS Warburg LLC. UBS Securities is the successor entity to UBS Warburg LLC.

[2] None of the defendants were members of HealtheTech's board of directors and thus did not receive a copy of the January 2002 presentation directly from UBS Securities.

any securities that they held in HealtheTech for 180 days following the IPO. All of the defendants signed such lockup agreements with UBS Securities. HealtheTech's IPO was completed on July 8, 2002. Defendants allege that HealtheTech's common stock did not perform as well as the projections indicated in the January 2002 presentation. Defendants do not allege that they purchased any shares in HealthTech from or through UBS Securities at any time.

Almost seven years later, on February 28, 2009, defendants filed a Statement of Claim to commence a FINRA arbitration proceeding against UBS Securities, titled <u>Voegeli et al. v. UBS Warburg, L.L.C.</u>, FINRA No. 09-01501.[3] In the Statement of Claim, defendants allege that UBS Securities is liable for, <u>inter</u> <u>alia</u>, breach of fiduciary duty, fraudulent inducement, negligent misrepresentation, and purported violations of § 10b of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in connection with its role in HealtheTech's IPO in 2002. The Statement of Claim seeks approximately $13 million in compensatory damages and more than $27 million in punitive damages. Defendants allege that their claims are subject to FINRA arbitration because defendants were purportedly customers of UBS Securities.

---

[3] FINRA is the primary regulator of broker dealers in the United States. UBS Securities is a FINRA member and as such, it has agreed to arbitrate disputes with its customers.

On June 25, 2009, UBS Securities filed a response to the Statement of Claim in which it refused to submit to arbitration and denied the arbitrability of defendants' claims. UBS Securities contends that the defendants have never been customers of UBS Securities and, in fact, have no other direct relationship with UBS Securities whatsoever. During the parties' first conference with the FINRA arbitral panel on September 14, UBS Securities requested that the arbitration be halted unless defendants could demonstrate that they were customers of UBS Securities. The arbitral panel declined UBS Securities' request and issued scheduling order setting January 15, 2010 as the date by which UBS Securities had to file any dispositive motion in the arbitration.

On October 20, 2009, UBS Securities filed a complaint seeking a preliminary and permanent injunction restraining defendants from prosecuting their claims in arbitration.[4] On October 21, UBS Securities filed a motion for a preliminary injunction pursuant to Rule 65(a), Fed. R. Civ. P. At a pretrial conference held on November 5, the parties agreed to jointly seek a stay of all proceedings in the underlying FINRA arbitration pending the outcome of the instant litigation,

---

[4] An amended complaint was filed on November 9, 2009, which added a claim pursuant to 28 U.S.C. § 2201 for a declaratory judgment that defendants cannot compel UBS Securities to arbitrate defendants' claims in the FINRA arbitration.

including any appeal.  The motion for a preliminary injunction

became fully submitted on December 14.  Following a conference

on January 11, 2010, both parties consented to the consolidation

of the preliminary injunction hearing with a trial on the merits

pursuant to Rule 65(a)(2), Fed. R. Civ. P.  The parties further

agreed that the merits of this dispute present only legal

questions that may be resolved on the basis of the papers

submitted in connection with UBS Securities' motion for a

preliminary injunction.

DISCUSSION

1.  Subject Matter Jurisdiction

Although defendants do not dispute the existence of subject

matter jurisdiction over this action, a federal court has an

independent obligation to determine whether subject matter

jurisdiction exists.  Arbaugh v. Y&H Corp., 546 U.S. 500, 514

(2006).  Given that UBS Securities and the defendants are all

citizens of Switzerland, complete diversity is lacking.[5]  In

Vaden v. Discover Bank, 129 S.Ct. 1262, 1273 (2009), the Supreme

Court recently held that under § 4 of the Federal Arbitration

Act ("FAA"), 9 U.S.C. § 4, federal courts have jurisdiction to

---

[5] UBS Securities is a limited liability company and therefore
possesses the citizenship of each of its members.  See Carden v.
Arkoma Assoc., 494 U.S. 185, 195-96 (1990); Handelsman v.
Bedford Village Assocs. Ltd., 213 F.3d 48, 51-52 (2d Cir. 2000).
Since one of UBS Securities' members is a citizen of
Switzerland, UBS Securities has Swiss citizenship, like all of
the defendants.

hear a petition to compel arbitration so long as the underlying

dispute between the parties "arises under" federal law.[6]  See

Vaden, 129 S.Ct. at 1273.  In so holding, the Court noted that

the FAA "bestows no federal jurisdiction but rather requires for

access to a federal forum an independent jurisdictional basis

over the parties' dispute."  Id. at 1271 (citation omitted).

Accordingly, in cases where the parties are not diverse, a

federal court may "look through" a petition under § 4 of the FAA

to determine whether it is predicated on an action that "arises

under" federal law.  Id. at 1273.

Although Vaden concerned a federal court's jurisdiction to

compel arbitration pursuant to § 4 of the FAA, its reasoning

applies to situations where, as here, a party seeks to stay or

enjoin an arbitration.  See, e.g., Bensadoun v. Jobe-Riat, 316

F.3d 171, 175 (2d Cir. 2003) (diversity jurisdiction); Merrill

Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 132 (2d

Cir. 2003) (per curiam) (diversity jurisdiction).

---

[6] Section 4 of the FAA provides, in pertinent part:

> A party aggrieved by the alleged failure, neglect, or
> refusal of another to arbitrate under a written
> agreement for arbitration may petition any United
> States district court which, save for such agreement,
> would have jurisdiction under Title 28, in a civil
> action or in admiralty of the subject matter of a suit
> arising out of the controversy between the parties,
> for an order directing that such arbitration proceed
> in the manner provided for in such agreement.

9 U.S.C. § 4.

In this case, the underlying dispute between UBS Securities and the defendants include purported violations of § 10b of the Securities Exchange Act of 1934 and Rule 10b-5.  Federal courts have jurisdiction over claims arising under the Securities Exchange Act.  <u>See</u> 15 U.S.C. § 78aa; 28 U.S.C. § 1331.  Because the substantive controversy between UBS Securities and the defendants "arises under" federal law, subject matter jurisdiction exists over UBS Securities' claims for declaratory and injunctive relief.

2.  Claims for Declaratory and Injunctive Relief

"To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted."  <u>Roach v. Morse</u>, 440 F.3d 53, 56 (2d Cir. 2006) (citation omitted).  The existence of irreparable harm and the absence of an adequate remedy at law are addressed first.

It is beyond dispute that irreparable harm would result if UBS Securities were compelled to arbitrate defendants' claims without having agreed to arbitration.  A party cannot be required to submit to arbitration any dispute which it has not agreed to so submit.  <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 83 (2002); <u>Telenor Mobile Commc'ns AS v. Storm LLC</u>, 584 F.3d 396, 405-06 (2d Cir. 2009).  Accordingly, the Second

Circuit has held that a party necessarily suffers irreparable harm if "forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." Merrill Lynch Inv. Managers, 337 F.3d at 129 (citation omitted). Furthermore, it is not merely expense that underlies the prohibition against forcing a party to arbitrate a dispute that it did not agree to arbitrate. UBS Securities would also lose its right to have defendants' claims adjudicated in a court of law, rather than in an arbitral forum to whose jurisdiction it has not consented. As such, there would be no adequate remedy at law if UBS Securities is forced to arbitrate defendants' claim in the FINRA proceeding.

With respect to the merits of UBS Securities' application for declaratory and injunctive relief, it is necessary to determine the arbitrability of defendants' claims. "The question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." Howsam, 537 U.S. at 83 (citing AT&T Techs., Inc. v. Commc'ns Workers of America, 475 U.S. 643, 649 (1986)); accord Telenor Mobile Commc'ns, 584 F.3d at 406. The parties do not dispute that the question of arbitrability in the instant action is subject to judicial determination.

Defendants do not allege that they have entered into a

contract or other agreement with UBS Securities to arbitrate
their claims. Instead, defendants contend that they were
"customers" of UBS Securities and therefore their claims are
subject to mandatory arbitration pursuant to FINRA Rule 12200.
Under FINRA Rule 12200, in order for a claim against a FINRA
member, such as UBS Securities, to be subject to mandatory
arbitration, the dispute must: (1) be "between a <u>customer</u> and a
member or associated person of a member"; and (2) arise "in
connection with the business activities of the member." FINRA
R. 12200 (emphasis added). The Second Circuit has held that
"interpretation of the [FINRA] arbitration provision is a matter
of contract interpretation, that New York law applies, and that
the provision should thus be interpreted to give effect to the
parties' intent as expressed by the plain language of the
provision." <u>Bensadoun</u>, 316 F.3d at 176 (citation omitted).[7] The
FINRA rules define "customer" broadly, excluding only "a broker
or dealer." FINRA R. 12100(i); <u>Bensadoun</u>, 316 F.3d at 176. The
Second Circuit has observed that the term "customer" as used in

_____

[7] <u>Bensadoun</u> concerned interpretation of Rule 10301(a) of the
National Association of Securities Dealers ("NASD") Code. The
NASD is the predecessor organization to FINRA. Like FINRA Rule
12200, NASD Rule 10301(a) required arbitration of "any dispute,
claim, or controversy . . . between a customer and a member
and/or associated person arising in connection with the business
of such member or in connection with the activities of such
associated persons . . . upon the demand of the customer." <u>See</u>
316 F.3d at 175-76. The Second Circuit's rulings concerning
interpretation of NASD Rule 10301(a) have equal force with
respect to FINRA Rule 12200.

FINRA Rule 12200 refers to "one involved in a business relationship with an [FINRA] member that is related directly to investment or brokerage services." Bensadoun, 316 F.3d at 177 (quoting Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770, 772 (8th Cir. 2001)).

Defendants advance two theories for why they can compel UBS Securities to arbitrate their claims pursuant to FINRA Rule 12220. First, defendants claim that they were induced to sign lockup agreements with the four underwriters of HealtheTech's IPO, including UBS Securities, after receiving copies of the January 2002 presentation prepared by UBS Securities for HealtheTech's board. Defendants maintain that the lockup agreements provide a sufficient contractual relationship with UBS Securities to permit them to compel UBS Securities to arbitrate defendants' claims under the FINRA rules. Second, defendants argue that because they are not "brokers" or "dealers," they are customers of UBS Securities according to the definition of "customer" in FINRA Rule 12100. Both theories are unavailing.[8]

With respect to the first theory, defendants do not explain

_____

[8] Some of the defendants also suggest in their declarations submitted in support of their opposition to the motion that they or companies with which they are associated had accounts with "UBS," apparently referring to the Swiss Bank, UBS AG. Defendants do not argue in their opposition brief, however, that these purported accounts with "UBS" make them customers of UBS Securities or an associated person of UBS Securities.

how the lockup agreements they signed entitle them to compel UBS
Securities to arbitrate their claims pursuant to FINRA Rule
12200.  Defendants do not allege that the lockup agreements
themselves include an arbitration provision.  Moreover,
defendants do not allege, nor could they, that signing the
lockup agreements rendered them "customers" of UBS Securities.
By signing the lockup agreements, defendants merely promised not
to sell any HealtheTech securities that they held until 180 days
after the IPO.  The lockup agreements did not create a "business
relationship" between defendants and UBS Securities that is in
any way "related directly" to UBS Securities providing
"investment or brokerage services" to the defendants.
Bensadoun, 316 F.3d at 177.  As such, defendants' claim that the
lockup agreements allow them to compel UBS Securities to
arbitrate their claims is without merit.

Defendants' second theory for why they qualify as customers
of UBS Securities is based on an untenable interpretation of the
definition of "customer" in the FINRA rules.  Defendants argue
that because FINRA Rule 12100 defines "customer" to exclude only
"brokers" and "dealers," and since they are neither brokers nor
dealers, they must therefore be customers of UBS Securities.
Defendants' interpretation of the definition of "customer" would
imply that a party seeking to compel arbitration pursuant to the
FINRA rules need not have an actual customer relationship with

any FINRA member; rather, the party need only not be a broker or dealer. Such an interpretation of FINA Rule 12100 would be absurd. Furthermore, defendants cite no legal authority to support their novel interpretation of the meaning of "customer" in the FINRA rules.

Moreover, the only legal authority provided by defendants in support of their argument is inapposite. Defendants cite John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48 (2d Cir. 2001), and Vestax Securities Corp. v. McWood, 280 F.3d 1078 (6th Cir. 2002), for the proposition that in some cases, a party may compel arbitration despite not having been a customer of the FINRA member in question. In both of these cases, however, the party seeking to compel arbitration was a customer of a FINRA member's associated person. See John Hancock, 254 F.3d at 51 (sales representative of NASD member); Vestax Securities, 280 F.3d at 1080 (registered agent of NASD member); see also Bensadoun, 316 F.3d at 176 (noting that there was "no question" in John Hancock that the aggrieved investors were customers of an "associated person" of a FINRA member). By contrast, in the instant action, defendants do not allege that they were customers of an "associated person" of UBS Securities such that they may compel arbitration pursuant to FINRA Rule 12200. Rather, defendants became shareholders of a company that UBS Securities was advising in connection with an IPO. This is

12

insufficient to establish a customer relationship with UBS Securities. Defendants have not shown that they had any other relationship, direct or indirect, with UBS Securities or with an associated person of UBS Securities. As such, defendants have failed to demonstrate that they were "customers" of UBS Securities for purposes of FINRA Rule 12200.

In sum, UBS Securities has shown that defendants' claims are not arbitrable in the FINRA forum or otherwise.[9] UBS Securities has also shown that it will suffer irreparable harm if defendants are not enjoined from proceeding in the FINRA arbitration for which there would be no adequate remedy at law. Accordingly, UBS Securities is entitled to the declaratory judgment and the permanent injunction it seeks.

---

[9] UBS Securities also argues that defendants' claims are time-barred under FINRA's Code of Arbitration Procedure. FINRA Rule 12206(a) provides: "No claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim." FINRA R. 12206(a). Because all of the alleged wrongful conduct of UBS Securities occurred in 2002, and defendants did not file their Statement of Claim until February 2009, UBS Securities contends that defendants' claims are untimely. Since defendants were not "customers" of UBS Securities under FINRA Rule 12200, and there is no arbitration agreement between defendants UBS Securities, it is unnecessary to resolve whether this Court may reach UBS Securities' statute of limitations argument.

CONCLUSION

The Clerk of Court shall enter a declaratory judgment that defendants cannot compel UBS Securities to arbitrate defendants' claims against UBS Securities in the FINRA arbitration proceeding, and shall enter a judgment permanently restraining defendants from prosecuting their claims against UBS Securities in the FINRA arbitration. The Clerk of Court shall close the case.

SO ORDERED:

Dated:    New York, New York
          January 26, 2010

                                  DENISE COTE
                          United States District Judge

14